# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ITG BRANDS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REYNOLDS AMERICAN, INC. and R.J. REYNOLDS TOBACCO COMPANY, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | C.A. No. 2017-0129-LWW |
| REYNOLDS AMERICAN, INC. and R.J. REYNOLDS TOBACCO COMPANY, | ) ) ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ITG BRANDS, LLC, | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Date Submitted: June 9, 2023
Date Decided: October 2, 2023

Stephen C. Norman, Matthew F. Davis, & Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Elizabeth B. McCallum, Gilbert S. Keteltas, Carey S. Busen, & Evan M. Mannering, BAKER & HOSTETLER, LLP, Washington, D.C.; Jim W. Phillips, Jr. & Kimberly M. Marston, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP, Greensboro, North Carolina; Charles E. Coble, BROOKS, PIERCE, MCLENDON,

HUMPHREY & LEONARD, LLP, Raleigh, North Carolina; *Counsel for Plaintiff and Counterclaim Defendant ITG Brands, LLC*

Gregory P. Williams, Rudolf Koch, Robert L. Burns & Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Noel J. Francisco, C. Kevin Marshall & William D. Coglianese; JONES DAY, Washington, D.C.; Stephanie E. Parker & Katrina L.S. Caseldine, JONES DAY, Atlanta, Georgia; David B. Alden & Kevin P. Riddles; JONES DAY, Cleveland, Ohio; Elli Leibenstein, GREENBERG TRAURIG, LLP, Chicago, Illinois; Stephen L. Saxl, GREENBERG TRAURIG, LLP, New York, New York; Andrea Shwayri Ferraro, GREENBERG TRAURIG, P.A., West Palm Beach, Florida; *Counsel for Defendants and Counterclaim Plaintiffs Reynolds American Inc. and R.J. Reynolds Tobacco Company*

**WILL, Vice Chancellor**

This is the latest chapter in a long-running saga between ITG Brands, LLC and R.J. Reynolds Tobacco Company. The action follows years of litigation in Florida that resulted in a settlement agreement requiring Reynolds to make annual payments to the State based on its product sales. Although this is the fourth memorandum opinion issued by the Court of Chancery in the matter, it will likely not be the last.

The present dispute centers on the 2014 sale of four cigarette brands from Reynolds to ITG. The sale was made under a detailed asset purchase agreement that allocates certain liabilities between the parties. After closing, Reynolds stopped making settlement payments to Florida for the cigarette brands ITG bought. In 2017, Florida sued to enforce the settlement agreement and obtained a judgment requiring Reynolds to continue making annual payments for the acquired brands.

Litigation in this court resulted. ITG and Reynolds disagree on whether the Florida judgment is a liability assigned to ITG under the asset purchase agreement. After two sets of cross-motions for judgment on the pleadings (before Chancellor Bouchard) and a round of cross-motions for summary judgment, the question of liability was decided. I concluded that under the plain terms of the APA, ITG was required to indemnify Reynolds for the payments made to Florida as a result of the Florida judgment based on sales of the acquired brands. This holding was not only

1

consistent with the text of the contract, but also avoided an absurd result where ITG would own and profit from the brands while Reynolds makes substantial payments to Florida for ITG's sales.

Now, the parties have again filed cross-motions for summary judgment—this time on remedies. Despite my having addressed liability in the prior stage of this case, ITG argues that it did not assume the Florida judgment liability under the asset purchase agreement. For the reasons explained below, I dispense with this argument and determine (once more) that ITG is responsible for the liability.

I go on to consider Reynolds' entitlement to remedies and ITG's arguments to eliminate or limit Reynolds' damages. Certain matters are readily resolved on summary judgment. Specifically, the asset purchase agreement permits Reynolds to recover the annual payments it made to Florida for sales of the acquired brands post-closing and the associated interest paid to Florida. Reynolds cannot, however, obtain indemnification from ITG for certain fees Reynolds paid for Florida' attorneys.

Other arguments raised by the parties are not properly settled through summary judgment. For example, ITG avers that Reynolds' damages must be offset by a favorable profit adjustment (due to its non-joinder in the Florida settlement agreement). This fact-intensive issue must be resolved after trial. Trial will also

2

determine the precise amount that Reynolds may recover from ITG and the availability of specific performance to address future payments.

## I.   FACTUAL BACKGROUND

The background of this action is described in three memorandum opinions by the Court of Chancery dated November 30, 2017, September 23, 2019 (the "2019 Opinion"), and September 30, 2022 (the "2022 Opinion").[1]  This opinion recites only the facts necessary to resolve the pending cross-motions for summary judgment on remedies.  Unless otherwise noted, the following summary is drawn from the undisputed facts described in the 2022 Opinion, the pleadings, and documentary exhibits submitted by the parties.[2]

---

[1] *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355 (Del. Ch. Nov. 30, 2017) ("2017 Op."); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2019 WL 4593495 (Del. Ch. Sept. 23, 2019) ("2019 Op."); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2022 WL 4678868 (Del. Ch. Sept. 30, 2022) ("2022 Op.").

[2] Citations in the form of "Reynolds' Opening Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Matthew D. Perri, Esq. in Support of Opening Brief in Support of Defendants' Motion for Summary Judgment on Remedies.  Dkt. 337.  Citations in the form of "Reynolds' Reply Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Matthew D. Perri, Esq. in Support of Defendants' Reply Brief in Support of Motion for Summary Judgment on Remedies and Answering Brief in Opposition to ITG's Motion for Summary Judgment on Remedies.  Dkt. 354.  Citations in the form of "ITG's Opening Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Evan Mannering to ITG Brands, LLC's Brief in Support of Motion for Summary Judgment on Remedies and in Opposition to Reynolds' Motion for Summary Judgment.  Dkts. 346-48.  Citations in the form of "ITG's Reply Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Evan Mannering to ITG Brands, LLC's Reply Brief in Support of Motion for Summary Judgment on Remedies.  Dkts. 362-63.

## A. The Florida Settlement Agreement

The background appropriately begins in Florida, where the liability prompting this litigation arose.

In February 1995, the State of Florida sued R.J. Reynolds Tobacco Company ("Reynolds Tobacco") and other major tobacco manufacturers (together with Reynolds Tobacco, the "Settling Defendants") for publicly misrepresenting the health risks and addictiveness of smoking.[3] On August 25, 1997, the Settling Defendants entered into an agreement with Florida to settle the State's claims for healthcare costs caused by smoking (the "Florida Settlement Agreement").[4] In exchange for Florida's dismissal, waiver, and release of its claims, the Settling Defendants agreed, among other things, to make ongoing settlement payments.[5]

Each Settling Defendant is required to make an annual inflation-adjusted settlement payment in perpetuity. This "Annual Payment" is allocated pro rata

---

[3] ITG Brands, LLC's Combined Opening Br. in Supp. of Mot. for Summ. J. on Remedies and Answering Br. in Opp'n to Reynolds' Mot. for Summ. J. (Dkt. 343) ("ITG's Opening Br.") 1; ITG's Opening Br. Ex. 5 ("Fla. Settlement Agreement"); 2019 Op. at *2.

[4] The settlement agreement was amended on September 11, 1998 (the "First Amendment") and June 1, 2001 (the "Second Amendment"). *See* Fla. Settlement Agreement at Ex. 003-018 to Ex. 003-127 ("Amend. No. 1"); Fla. Settlement Agreement at Ex. 003-128 to Ex. 003-145 ("Amend. No. 2"). For clarity: the original Florida Settlement Agreement is at pages Ex. 003-001 to Ex. 003-017 of the document; the First Amendment is at pages Ex. 003-018 to Ex. 003-127; and the Second Amendment is at pages Ex. 003-128 to Ex. 003-145.

[5] Fla. Settlement Agreement at Ex. 003-002.

among the Settling Defendants based on their market shares of the volume of cigarette shipments.[6] Each Annual Payment is further adjusted based on a "formula for calculating volume adjustments" set out in Appendix A to the Florida Settlement Agreement.[7] Appendix A provides for a "Volume Adjustment" and a related "Profit Adjustment."

The Volume Adjustment considers the aggregate volume of cigarettes shipped by the Settling Defendants for domestic consumption in the current year.[8] If the current year's aggregate volume decreases compared to a 1997 base year, the Annual Payment is correspondingly reduced.[9] The Volume Adjustment is allocated pro rata among the Settling Defendants according to relative market share, which is calculated based on volume.[10]

A base Annual Payment that is decreased by a negative Volume Adjustment is subject to partial offset by a Profit Adjustment. The Profit Adjustment ensures

---

[6] Fla. Settlement Agreement Amend. No. 1 ¶ 7.

[7] Fla. Settlement Agreement Amend. No. 2 at App. A ¶ A. Appendix A was added to the Florida Settlement Agreement as part of the Second Amendment.

[8] Fla. Settlement Agreement Amend. No. 1 ¶ 7; Fla. Settlement Agreement Amend. No. 2 at App. A ¶ A.

[9] The base year for calculating the aggregate volume is 1997. Fla. Settlement Agreement Amend. No. 2 at App. A ¶ A.

[10] Fla. Settlement Agreement Amend. No. 1 ¶ 7. Between 1999 and 2002, the Annual Payments were: $247.5 million, $275 million, $357.5 million, and $357.5 million. From 2003 onward, the Annual Payment was (and remains) $440 million. *Id.*

5

that if the Settling Defendants' post-settlement shipment volumes decrease but their profits increase, settlement payments increase as well. The Profit Adjustment applies if the Settling Defendants' aggregate net operating profits from domestic sales of cigarettes in the current year exceed aggregate inflation-adjusted "base year" profits from a 1997 base year.[11] The Profit Adjustment is then allocated to each Settling Defendant.

## B. The Florida Litigation

On July 15, 2014, Reynolds American, Inc. (the indirect parent of Reynolds Tobacco, together referred to as "Reynolds") and ITG Brands, LLC entered into an Asset Purchase Agreement (the "APA"), under which Reynolds sold four cigarette brands (the "Acquired Brands" or "Acquired Tobacco Cigarette Brands") to ITG.[12] Following the June 12, 2015 closing of the APA, neither Reynolds nor ITG made Annual Payments to Florida for Acquired Brands sales.[13] Consequently, on January 18, 2017, Florida and Philip Morris filed motions to enforce the Florida Settlement Agreement against Reynolds and ITG (the "2017 Action").[14]

---

[11] Fla. Settlement Agreement Amend. No. 2 at App. A ¶ B(ii); *id.* ¶ 7.

[12] 2022 Op. at *2. These four brands are Winston, Salem, Kool, and Maverick. *Id.*

[13] *Id.* at *5.

[14] 2022 Op. at *5. In the 2017 Action, Florida, and Philip Morris sued Reynolds Tobacco, an "Affiliate" of Reynolds. The Florida Judgment Liability (as defined below) is Reynolds Tobacco's. *Id.* at *19 & n.200. Because ITG's indemnification obligation runs to Reynolds and its "Affiliates," Reynolds Tobacco is referred to as Reynolds in this decision.

6

On December 27, 2017, the Florida court entered an order granting in part Florida and Philip Morris' motions to enforce the Florida Settlement Agreement.[15] The court held that Reynolds' settlement obligations to Florida were not extinguished when it sold the Acquired Brands.[16] The court explained that Reynolds remained "obligated to make the payments [on the Acquired Brands] pursuant to the Florida [Settlement] Agreement," absent ITG's joinder.[17]

## C.    The Florida Judgment

On August 15, 2018, the Florida court entered a final order and judgment (the "Florida Judgment").[18] The Florida Judgment declared that "unless and until ITG becomes a Settling Defendant, . . . Reynolds is liable to make Annual Payments to [Florida] . . . for the sales of cigarettes under the [Acquired Brands] . . . with respect

---

*See* ITG Brands, LLC's Verified Compl. for Declaratory and Inj. Relief and Specific Performance (Dkt. 1) Ex. 1 ("APA") § 11.02.

[15] 2022 Op. at *5.

[16] *Id.*

[17] *Id.*

[18] *Id.* at *6. The Florida Judgment was stipulated by Florida, Philip Morris, Reynolds, and ITG. It followed a May 22, 2018 order denying Reynolds' motion regarding a Profit Adjustment dispute. *See* ITG's Opening Br. Ex. 2. In the 2017 Litigation, Philip Morris argued that Reynolds had manipulated certain Profit Adjustment calculations. Transmittal Decl. of Evan Mannering to ITG Brands, LLC's Br. Supp. Mot. Summ. J. (Dkt. 229-39) ("ITG's Liability Br. Ex.") Ex. 10. Reynolds' motion sought a declaration that the issue was moot considering the Florida court's December 27, 2017 order. ITG's Opening Br. Ex. 38.

to the [post-closing] period . . . in perpetuity."[19] The court ordered Reynolds to pay past-due Annual Payments predating the Florida Judgment (the "Florida Judgment Liability"), pre- and post-judgment interest on those past-due payments (the "Florida Judgment Interest"), future Annual Payments for the Acquired Brands (absent joinder by ITG), and Florida's "reasonable attorneys' fees and costs" from the 2017 Action (the "Florida Attorneys' Fees").[20]

After the Florida Judgment, Reynolds made several settlement payments to satisfy the Florida Judgment Liability.

First, on October 5, 2020, Reynolds paid Florida $192,869,589.86 for amounts owed under the Florida Judgment plus interest running from the date that each settlement payment had been due.[21] According to Reynolds, $124,370,076 was for outstanding volume payments based on ITG's sales of Acquired Brands cigarettes in each of 2015 through 2019 (i.e., the Annual Payments with Volume

---

[19] ITG's Opening Br. Ex. 3 ("Fla. J.") ¶ 4.

[20] *Id.* ¶¶ 1, 4, 7.

[21] Opening Br. in Supp. of Defs.' Mot. for Summ. J. on Remedies (Dkt. 336) ("Reynolds' Opening Br.") 9; *id.* at Ex. D; *see* Fla. J. ¶ 1 & n.2.

Adjustments for those years), plus $19,732,311 in interest (i.e., the associated Florida Judgment Interest).[22] The remainder included a profit-based component.[23]

Second, on December 31, 2020, Reynolds paid Florida $156,398,127.23 for settlement payments related to ITG's sales of the Acquired Brands and Reynolds' own cigarettes in 2020.[24] The payment did not include pre-judgment or post-judgment interest.[25] Reynolds contends that, of this amount, $26,953,586 was for the volume-related portion of the Annual Payment based on ITG's sales of the Acquired Brands in 2020.[26]

Third, on December 31, 2021, Reynolds paid Florida $156,273,049.95 for settlement payments related to ITG's sales of the Acquired Brands and Reynolds' own cigarettes in 2021.[27] The payment did not include pre-judgment or post-judgment interest.[28] Reynolds asserts that $27,036,206 of the amount was for the

---

[22] Reynolds' Opening Br. 8-9.

[23] *Id.*

[24] *Id.* at 10; Reynolds' Opening Br. Ex. G.

[25] Reynolds' Opening Br. 10.

[26] *Id.* at 9.

[27] *Id.* at 10; Reynolds' Opening Br. Ex. I.

[28] Reynolds' Opening Br. 10.

volume-related portion of Annual Payment based on ITG's sales of the Acquired Brands in 2021.[29]

In addition, Reynolds made three payments to Florida and Florida's outside counsel in connection with the 2017 Action (i.e., the Florida Attorneys' Fees). On December 11, 2020, Reynolds paid $2,505,280.15 to Florida and $594,719.85 to a law firm that Florida had retained.[30] And on June 18, 2021, Reynolds paid $135,000 to a different law firm that represented Florida.[31]

### D.       This Court's Prior Ruling on Liability

We now return from Florida to Delaware, where litigation has been pending since 2017. The present matter involves whether, under the APA, ITG must indemnify Reynolds for the Florida Judgment Liability and other related liabilities.

This memorandum opinion is the fourth substantive decision in the Delaware litigation.[32] Most recently, the 2022 Opinion resolved cross-motions for summary judgment on liability by applying the APA's terms—specifically, §§ 2.01(c)(iv), (c)(v), and (c)(vii). The 2022 Opinion held that "the plain language of § 2.01(c)(iv)

---

[29] *Id.*

[30] Reynolds' Opening Br. Ex. M.

[31] *Id.*

[32] Similar disputes arose with respect to the Minnesota and Texas settlement agreements. Those disputes have since resolved, and ITG joined those respective settlement agreements. 2022 Op. at *5.

10

provides that ITG assumed the Florida Judgment Liability at issue and that § 2.01(c)(iv) is not in conflict with § 2.01(c)(vii)."[33] As a result, the decision did "not address the parties' arguments about § 2.01(c)(v)."[34] The 2022 Opinion concluded that Reynolds was entitled to indemnification under § 11.02(a)(vi) for "the amounts Reynolds [] has paid (and will pay) due to the Florida Judgment."[35] But the decision explained that further proceedings were necessary to address the amount of damages owed to Reynolds and whether Reynolds was entitled to equitable relief.[36]

### E. The Cross-Motions for Summary Judgment on Remedies

On November 2, 2022, following the 2022 Opinion's decision on liability, Reynolds moved for summary judgment on remedies. On December 2, ITG filed a submission opposing Reynolds' arguments and cross-moving for summary judgment. Briefing on the cross-motions was completed on January 23, 2023.[37] I

---

[33] *Id.* at *12.

[34] *Id.*

[35] *Id.* at *19.

[36] *Id.* at *20.

[37] Dkt. 362. On February 3, non-party Philip Morris filed a letter addressing the parties' Profit Adjustment allocation arguments made by ITG, which are described below. Dkt. 366; *see infra* Section II.B. In its letter, Philip Morris supports ITG's argument for a Profit Adjustment allocation offset. But Philip Morris maintains that it should receive the benefit of any offset and might intervene in further. *Id.* at 5 n.2. Presently, no motion to intervene has been filed.

11

heard oral argument on February 23.[38]  Following oral argument, I requested supplemental briefing on an issue given limited attention in the parties' briefs.[39]  Supplemental briefing was completed on June 9 and the matter was taken under advisement at that time.[40]

## II.   LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment is granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[41]  "[T]he facts must be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact."[42]  "If there are material facts in dispute, it is inappropriate to grant summary judgment and the case should be submitted to the fact finder to determine the disposition of the matter."[43]

---

[38] Dkts. 369-70.

[39] Dkt. 371.  The issue concerned ITG's argument that the Florida Judgment Liability is an excluded "Straddle Tobacco Action Liability," which is resolved below.  *See infra* Section II.A.1.

[40] *See* Dkts. 385-86.

[41] Ct. Ch. R. 56(c).

[42] *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldgs. Co.*, 853 A.2d 124, 126 (Del. Ch. 2004).

[43] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

Reynolds moves for summary judgment on its entitlement to over $231,628,197 from ITG for prior losses, including:

- $198,092,179 in payments to Florida, in principal and interest, based on the volume-related settlement payments attributable to sales of the Acquired Brands;[44]

- $3,235,000 of Florida Attorneys' Fees;[45] and

- over $7,400,000 for Reynolds' attorneys' fees and costs in this litigation (the "Delaware Attorneys' Fees").[46]

Reynolds avers that it is entitled to pre- and post-judgment interest on the payments to Florida and the Florida Attorneys' Fees.[47] For its future losses, Reynolds seeks an order requiring ITG to indemnify Reynolds for payments made under the Florida Judgment, or, alternatively, to join the Florida Settlement Agreement.[48]

In cross-moving for summary judgment, ITG argues that the Florida Judgment Liability is an "Excluded Liability" under the APA. ITG also contends that the Florida Attorneys' Fees, Florida Judgment Interest, and Delaware Attorneys' Fees

---

[44] This amount is calculated as follows: $124,370,076 + $19,732,311 + $26,953,586 + $27,036,206 = $198,092,179. *See supra* notes 21-29 and accompanying text. Reynolds does not seek indemnification for the Profit Adjustment portion of the payments or the those related to sales of its own cigarettes.

[45] *See supra* notes 30-31 and accompanying text.

[46] Reynolds' Opening Br. 14.

[47] Dkt. 335.

[48] *Id.*

sought by Reynolds are not indemnifiable. ITG raises various defenses to reduce its indemnification obligation, including an offset for the benefit Reynolds received from the Profit Adjustment allocation due to ITG's non-joinder, as well as acquiescence, failure to mitigate, and material breach. ITG seeks an order that it is liable for none of, or a reduced portion of, the damages claimed by Reynolds.[49]

Some of these matters can appropriately be settled through summary judgment. Others cannot. "Although summary judgment is encouraged when possible, there is no absolute right to summary judgment."[50] "[T]he court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application."[51]

### A. Reynolds' Entitlement to Recover Its Losses from the Florida Judgment

Certain of the issues raised in the motions turn on contract interpretation and are "readily amenable to summary judgment" because "proper interpretation of

---

[49] Dkt. 343.

[50] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005).

[51] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2017 WL 3168966, at *2 (Del. Ch. July 26, 2017) (citations omitted).

language in a contract . . . is treated as a question of law."[52]  When resolving such matters, the court "will grant summary judgment in two scenarios: (1) when the contract is unambiguous, or (2) when the extrinsic evidence fails to create a triable issue of material fact."[53]

As discussed below, I conclude that Reynolds' damages are not "Excluded Liabilities" under the APA's terms.  I also conclude that the Florida Attorneys' Fees are not "Losses" as defined in the APA.[54]  The Florida Judgment Interest is, however, within the definition of Losses.  As to the Delaware Attorneys' Fees, I cannot presently resolve whether they are indemnifiable.

### 1. Whether Reynolds' Damages Are Straddle Liabilities

Reynolds seeks indemnification for the Florida Judgment Liability under § 11.02(a)(vi) of the APA, which provides that ITG "shall indemnify, defend and hold harmless [Reynolds] and its Affiliates . . . against all Losses that [Reynolds and its Affiliates] may suffer or incur, or become subject to, as a result of . . . any

---

[52] *Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *3 (Del. Ch. Mar. 19, 2021) (first quoting *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 7, 2013); and then quoting *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991)).

[53] *Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *7 (Del. Ch. Oct. 31, 2019), *aff'd*, 241 A.3d 220 (Del. 2020); *see GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 784 (Del. 2012) ("[I]n a dispute over the proper interpretation of a contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation.").

[54] APA Ex. A at A-10 (defining "Losses"); *see infra* note 122.

Assumed Liability."[55] The "Assumed Liabilities" (enumerated in § 2.01(c)) are those that ITG agreed to assume from Reynolds in purchasing the Acquired Brands.[56] The 2022 Opinion held that the Florida Judgment Liability is an Assumed Liability under § 2.01(c)(iv), in which ITG agreed to assume "all Liabilities" arising out of its post-closing use of the assets it acquired through the APA.[57]

Now, ITG argues that the Florida Judgment Liability is a "Straddle Tobacco Action Liability" (for short, "Straddle Liability"), which is expressly carved out of the Assumed Liabilities identified in § 2.01(c)(v).[58] Straddle Liabilities are a type of Excluded Liability (enumerated in § 2.01(d)) that "shall be paid, performed and discharged" by Reynolds "[n]otwithstanding any other provision" of the APA.[59] Thus, if the Florida Judgment Liability were a Straddle Liability, it would not be indemnifiable under § 11.02(a)(vi).

Straddle Tobacco Action Liabilities are defined as:

all Liabilities *arising out of or in connection with any smoking and health-related Action* filed in the Straddle Tobacco Action Period arising out of, in connection with or relating to: (a) the manufacture, packaging, labeling, delivery, sale, resale, distribution, marketing or

---

[55] APA § 11.02(a)(vi).

[56] *Id.* § 2.01(c); *see* 2022 Op. at *2.

[57] 2022 Op. at *13-14 (quoting APA § 2.01(c)(iv)).

[58] ITG's Opening Br. 21 n.68; *see also* APA § 2.01(c)(v).

[59] APA § 2.01(d). The Assumed Liabilities are "subject to" the Excluded Liabilities. *Id.* § 2.01(c)(v) (identifying a carve-out for Straddle Tobacco Action Liabilities).

16

promotion of one or more of the Acquired Tobacco Cigarette Brands; or (b) the use or consumption of, or exposure to one or more Acquired Tobacco Cigarette Brands and provided that such Action also gives rise to Seller Tobacco Liabilities.[60]

"Seller Tobacco Liabilities" are:

all Liabilities arising out of or in connection with any Action (whether commenced before, on or after the Closing Date) to the extent relating to the development, manufacture, packaging, labeling, production, delivery, sale, resale, distribution, marketing, promotion, use or consumption of, or exposure to, tobacco products, including smoking and health-related claims, in each case, to the extent relating to the period ending on the Closing Date and related to one or more of the Acquired Tobacco Cigarette Brands.[61]

The Straddle Tobacco Action Period is "the period commencing on the Closing Date [June 12, 2015] and ending on the date that is eight years from the Closing Date."[62]

---

[60] APA Ex. A at A-17; *see* APA § 2.01(d)(v) ("Notwithstanding any other provision of this Agreement, the Acquiror is not assuming . . . (v) all Straddle Tobacco Action Liabilities"). The definition of Straddle Tobacco Action Liabilities includes certain exceptions that are excluded from the quote for the sake of brevity. *See* APA Ex. A at A-17. "Action" means "any claim action, suit, arbitration, inquiry, investigation or other proceeding of any nature (whether criminal, civil, legislative, administrative, regulatory, prosecutorial or otherwise) by or before any court, arbitrator or Governmental Authority or similar body." *Id.* at A-1.

[61] APA § 2.01(d)(i); *see* APA Ex. A at A-17.

[62] APA Ex. A at A-17; *see* 2022 Op. at *3 n.19 (explaining that the "Closing Date" was June 12, 2015) (citing APA § 2.03).

ITG waived the argument that the Florida Judgment Liability is an excluded Straddle Liability.[63] It was not raised in briefing the motions resolved in the 2019 Opinion, which addressed the parties' conflicting interpretations of § 2.01(c)(iv), (c)(v), and (c)(vii).[64] In its opening summary judgment brief on liabilities (as resolved in the 2022 Opinion), ITG mentioned Straddle Liabilities once in a footnote.[65] The first time ITG raised a substantive Straddle Liability argument was in opposing Reynolds' motion for summary judgment on liability.[66] But even then, ITG did not contend—as it does now—that the Florida Judgment Liability was an Excluded Liability under § 2.01(d)(v). Rather, ITG argued that insofar as the court

---

[63] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (holding that the plaintiff waived arguments by failing to raise them in its opening brief); *see also Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) (explaining that "under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion" and "should not hold matters in reserve for reply briefs"); *Jung v. El Tinieblo Int'l, Inc.*, 2022 WL 16557663, at *11 (Del. Ch. Oct. 31, 2022) ("Generally, the failure to raise an argument in one's opening brief constitutes a waiver of that argument.").

[64] The 2019 Opinion noted that § 2.01(c)(v) "excludes 'Straddle Tobacco Action Liabilities,' but neither party has argued that this exclusion is relevant here." 2019 Op. at *6 n.43.

[65] ITG Brands, LLC's Br. in Supp. of Mot. for Summ. J. (Dkt. 222) 39 n.13. Curiously, ITG described the Straddle Liabilities exception in § 2.01(c)(v) as suggesting that "the parties were focused on products liability" rather than settlement claims—the opposite of ITG's current position.

[66] ITG Brands, LLC's Opp. to Defs.' Mot. for Summ. J. (Dkt. 249) ("ITG's Liability Opp. Br.") 21-25.

18

applied § 2.01(c)(v), the Florida Judgment Liability should be viewed as falling within the Straddle Liabilities carveout.[67]

Of course, § 2.01(c)(v) and § 2.01(d)(v) are mutually exclusive.[68] If the Florida Judgment Liability were not an Assumed Liability under § 2.01(c)(v) because it was a Straddle Liability, it would necessarily be an Excluded Liability under § 2.01(d)(v). Still, ITG did not squarely raise this argument at the liability stage, thereby prejudicing Reynolds and creating inefficiency and delay.[69] In a contract as tortuous as the APA, it is not always obvious how the various provisions of the APA interact.

---

[67] *See* ITG's Liability Opp. Br. 23 ("[I]f the Court agrees with Reynolds that § 2.01(v) applies, all the requirements for the Straddle liability exception are met, and the Liability remains Reynolds' responsibility."); *see also id.* at 21 (similar); ITG Brands, LLC's Reply Br. in Supp. of Mot. for Summ. J. (Dkt. 256) 20 n.5 ("[I]f this Court finds that § 2.01(c)(v) is applicable, the settlement Liabilities are excluded 'straddle' liabilities."); ITG's Hr'g Slides in Supp. of Mot. for Summ. J. on Liability (Dkt. 264) 122-27 (title: "Alternatively, if Section 2.01(c)(v) Applies, the Liability is a 'Straddle' Liability"). I did not, however, apply § 2.01(c)(v); summary judgment was granted in Reynolds' favor under § 2.01(c)(iv). 2022 Op. at *12 ("I conclude that the plain language of § 2.01(c)(iv) provides that ITG assumed the Florida Judgment Liability at issue and that § 2.01(c)(iv) is not in conflict with § 2.01(c)(vii). I therefore need not address the parties' arguments about § 2.01(c)(v).").

[68] *Compare* APA § 2.01(c)(v) (listing "Acquiror Assumed Liabilities" as those "other than Straddle Tobacco Action Liabilities"), *with id.* § 2.01(d)(v) (listing Straddle Tobacco Action Liabilities as "Acquiror Excluded Liabilities").

[69] *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011) ("The general rule [is] that a party waives any argument it fails properly to raise [which] shows deference to fundamental fairness and the common sense notion that, to defend a claim or oppose a defense, the adverse party deserves sufficient notice of the claim or defense in the first instance.").

In any event, ITG's argument fails on the merits. A Straddle Tobacco Action Liability must, among other things, (1) "aris[e] out of or in connection with a[] smoking and health-related Action" that (2) was "filed in the Straddle Tobacco Action Period."[70] The 2017 Action in Florida, where Florida and Philip Morris filed motions to enforce the Florida Settlement Agreement, falls in the relevant time period.[71] The primary dispute is whether the 2017 Action from which the Florida Judgment Liability arises is a "smoking and health-related Action."[72]

"Smoking and health-related" is not defined in the APA. A review of the phrase's use throughout the APA is, however, instructive. Together, several provisions of the APA assign liabilities arising out of "smoking and health-related" claims and actions using temporal markers.[73]

Section 2.01(c)(v) provides that ITG assumed liabilities arising out of post-closing "smoking and health-related claims."[74] Conversely, § 2.01(d)(v) provides

---

[70] APA Ex. A at A-17.

[71] The relevant "Action" cannot be the one commenced in Florida in 1995 since it falls outside the Straddle Tobacco Action Period.

[72] APA Ex. A at A-17.

[73] Sections 2.01(c)(v), 2.01(d)(i), and 11.01(a)(v)(A) each use the phrase: "to the extent relating to the development, manufacture, packaging, labeling, production, delivery, sale, resale, distribution, marketing, promotion, use or consumption of, or exposure to, tobacco products, including *smoking and health-related claims*." APA §§ 2.01(c)(v), 2.01(d)(i), 11.01(a)(v)(A) (emphasis added).

[74] *Id.* § 2.01(c)(v); *see* 2022 Op. at *18.

20

that Reynolds retains responsibility for liabilities from pre-closing "smoking and health-related claims."[75] Section 11.01(a)(v)(A) provides for a pro rata allocation to ITG and Reynolds of liability for "smoking and health-related claims" spanning the pre-closing and post-closing periods.[76] And Straddle Liability is an exception to § 2.01(c)(v), involving (1) conduct that "straddles" the time of Reynolds' and ITG's ownership of the Acquired Brands and (2) claims filed post-closing. The following table provides a summary:

| Allocation of Liabilities[77] | | | | |
|---|---|---|---|---|
| **Liability Type** | **Acquiror Tobacco Liabilities** | **N/A** | **Seller Tobacco Liabilities** | **Straddle Tobacco Action Liabilities** |
| APA Provision | § 2.01(c)(v) | § 11.01(a)(v)(A) | § 2.01(d)(i) | § 2.01(d)(v) |
| Requirements | Relates to the post-closing period | Relates to both pre-and post-closing periods | Relates to the pre-closing period | Filed in the Straddle Tobacco Action Period |
| Assumed or Excluded? | Assumed Liability | Both Assumed Liability and Excluded Liability | Excluded Liability | Excluded Liability |
| Responsible Party | ITG | Pro rata to ITG and Reynolds | Reynolds | Reynolds |

Interpreting "smoking and health-related Actions" to include the 2017 Action would be inconsistent with this structure. The 2017 Action, arising from a motion

---

[75] APA § 2.01(d)(v).

[76] *Id.* § 11.01(a)(v)(A).

[77] Specifically, this table reflects the allocation of liabilities arising out of "smoking and health-related Actions" and "smoking and health-related claims."

to enforce a contract, did not concern conduct "straddling" the period between Reynolds's and ITG's ownership of the Acquired Brands. The 2017 Action is about contractual liability for settlement payments based on sales of Acquired Brands cigarettes post-closing.

Yet ITG argues that the that the term "smoking and health-related" should be read to merely require "a connection to smoking and health."[78] According to ITG, the 2017 Action is "smoking and health-related" because the underlying contract at issue—the 1997 Florida Settlement Agreement—settled the 1995 litigation seeking "reimbursement for healthcare costs caused by smoking."[79] Reynolds, for its part, contends that the term "smoking and health-related Action" refers only to "tort lawsuits, for harm due to 'smoking' and 'related' to 'health.'"[80] In Reynolds' view, the 2017 Action is outside the Straddle Liability definition because it was a breach of contract suit.[81]

---

[78] ITG Brands, LLC's Suppl. Br. on Straddle Tobacco Action Liabilities (Dkt. 375) ("ITG's Suppl. Br.") 3.

[79] ITG's Opening Br. 21-22 (arguing that the Florida Judgment Liability follows "settlements [that] resolved litigation in which the states 'sought reimbursement for healthcare costs caused by smoking'" (quoting 2022 Op. at *2)).

[80] Defs.' Opening Suppl. Summ. J. Br. on Remedies (Dkt. 379) ("Defs.' Suppl. Br.") 2. As noted, ITG previously indicated that it agrees with this reading. *See supra* note 65.

[81] *See* Defs.' Reply Br. in Supp. of Mot. for Summ. J. on Remedies and Answering Br. in Opp'n to ITG's Mot. for Summ. J. on Remedies (Dkt. 353) ("Reynolds' Reply Br.") 6 ("A breach-of-contract action does not become 'smoking and health-related' simply because

After a careful review of the APA, I conclude that the phrase "smoking and health-related" is unambiguous. "The parties' steadfast disagreement over interpretation" alone does not give rise to ambiguity.[82] ITG's reading might have some appeal if the phrase "smoking and health-related" were viewed in isolation. But ITG's interpretation is unreasonable when the provision is viewed in the context of the entire contract.[83] ITG's position is inconsistent with the use of the phrase elsewhere in the APA, would create absurdities, and would render at least one other provision a nullity. Only Reynolds' interpretation is reasonable.

### a. "Smoking and Health-Related" In Isolation

"Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[84] Actions about "smoking" and "health" include tort

---

the contract related to past smoking-and-health litigation, any more than an action alleging breach of a contract for installing solar panels becomes an 'environmental-related' case.").

[82] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("The determination of ambiguity lies within the sole province of the court.") (citation omitted); *see also Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) ("Critically, a contractual provision is 'not rendered ambiguous simply because the parties in litigation differ' as to the proper interpretation.") (citation omitted).

[83] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.").

[84] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn*, 991 A.2d at 1159); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in

23

lawsuits against cigarette companies.[85] The addition of the word "related" arguably broadens the term "smoking and health" to other contexts. "Related" means "[c]onnected in some way; having relationship to or with something else."[86] The word is "paradigmatically broad."[87]

As such, the 2017 Action might be "related" to "health" and "smoking" if those terms were viewed outside the broader context of the APA.[88] In its 1995 lawsuit, Florida "sought reimbursement for healthcare costs caused by

---

determining the plain meaning of terms which are not defined in a contract."); *see* APA § 12.12(a) (providing that Delaware law governs the APA).

[85] *See* Defs.' Suppl. Br. Ex. A ¶ 2 (Case Management Order, *In re Cigarette Smoking & Health Cases*, No. 95-CL-9876 (Fla. Cir. Ct. June 28, 1996) (using the term "cigarette smoking-and-health cases" to refer to tort lawsuits)); 1 Joseph M. McLaughlin, McLaughlin on Class Actions §§ 5.39 & 5.58 (19th ed. 2022) (using the term "[t]obacco smoking and health litigation" to refer to tort lawsuits).

[86] *Related*, Black's Law Dictionary (11th ed. 2019); *see also Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1083 (Del. Ch. Aug. 17, 2021) (defining "relating to" as "to have some relation to" or "to have bearing or concern [on]; [to] pertain" (quoting *Relating to*, Black's Law Dictionary (5th ed. 1979)); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("The ordinary meaning of ['relating to'] is a broad one.") (citing *Relating to*, Black's Law Dictionary (5th ed. 1979)).

[87] *Fla. Chem. Co., LLC*, 262 A.3d at 1083; *see also DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *10 (Del. Ch. Jan. 23, 2006) (describing "related" as "one of the "far-reaching terms often used . . . to capture the broadest possible universe").

[88] The "and" in "smoking and health-related" could be read to be either conjunctive or disjunctive. *See Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2008 WL 902406, at *7 (Del. Ch. Apr. 3, 2008); *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1045 (Del. 2023). For the sake of argument, I adopt the broader, disjunctive reading here.

smoking."[89]  The Florida Settlement Agreement provides that payments "constitute . . . reimbursement for Medicaid" and "medical expenses."[90]  The Constitution of the State of Florida even requires that settlement proceeds be used for smoking and health-related purposes.[91]  Florida brought the 2017 Action to ensure that ITG and Reynolds continued to provide these reimbursements.  If neither Reynolds nor ITG made payments under the Florida Settlement Agreement, Florida "would lose the billions of bargained for dollars intended for public healthcare expenses caused by [smoking]."[92]

---

[89] ITG's Suppl. Br. Ex. 1 ¶¶ 1-5, 46-49.

[90] Fla. Settlement Agreement ¶ II.B.4; *see also Pace v. Am. Int'l Grp., Inc.*, 2010 WL 1325657, at *7 (N.D. Ill. Mar. 30, 2010) (holding that an action for failure to make settlement payments "relat[ed]" to the underlying tort claim that led to the settlement agreement); *Bridge v. McHenry Truck Lines, Inc.*, 1998 WL 427611, at *3 (N.D. Ill. July 24, 1998) (holding that ERISA preempted a suit for breach of a settlement agreement to resolve a claim for pension contributions as "relate[d] to any employee benefit plan"); *but see Allstate Ins. Co. v. Spinelli*, 443 A.2d 1286, 1287 (Del. 1982) (holding that an action by an insured against his automobile insurance carrier to recover uninsured motorist benefits "essentially sound[ed] in contract rather than in tort" even though the benefits stemmed from a personal injury).

[91] Art. X, § 27, Fla. Const. ("[A] portion of the money that tobacco companies pay to the State of Florida under the Tobacco Settlement each year shall be used to fund a comprehensive statewide tobacco education and prevention program consistent with recommendations of the U.S. Centers for Disease Control and Prevention (CDC) . . . .").

[92] ITG's Suppl. Br. Ex. 5 (Jan. 18, 2017 Fla. Mot.) 3.

b. "Smoking and Health-Related" In Context

The phrase "smoking and health-related Action" cannot, however, be read in isolation. I must construe the contract "as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[93] "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[94] ITG's expansive reading of the phrase "smoking and health-related" contravenes these principles.

To reiterate, the APA is structured to allocate liabilities arising out of "smoking and health-related" claims and actions depending on the time period.[95] In doing so, the APA uses the phrase "smoking and health-related" in three places in addition to the definition of Straddle Liability.[96] "[T]he same phrase should be given the same meaning when it is used in different places in the same contract."[97]

---

[93] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

[94] *Athenian Venture P'rs I, L.P.*, 36 A.3d at 779.

[95] *See supra* notes 73-77 and accompanying text; "Allocation of Liabilities" tbl. at 21.

[96] APA §§ 2.01(c)(v), (d)(i); *id.* § 11.01(a)(v)(A).

[97] *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *6 (Del. Ch. Oct. 11, 2019) (The "presumption of consistent usage . . . provides that absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract.") (citation omitted).

The first two uses of "smoking and health-related" are in § 2.01. Both §§ 2.01(c)(v) and 2.01(d)(i) include the phrase "smoking and health-related claims" in identical lists of conduct from which "Liabilities arising out of or in connection with any Action" might arise.[98] The crucial distinction is the period to which the claims relate. Section 2.01(c)(v) confirms that liabilities (other than Straddle Liabilities) arising out of "smoking and health-related claims . . . commencing after the Closing Date" are ITG's responsibility.[99] Section 2.01(d)(i) confirms that liabilities arising out of "smoking and health-related claims . . . relating to the period ending on the Closing Date"—defined as Seller Tobacco Liabilities—remain Reynolds' responsibility.[100]

The third use, in § 11.01(a)(v), addresses Reynolds' indemnification of ITG for these Seller Tobacco Liabilities. The provision is bifurcated into two subsections. Section 11.01(a)(v)(A) concerns an "Action [] brought in relation to the alleged personal injury or other damage to person(s) caused by smoking or

---

[98] APA §§ 2.01(c)(v), (d)(i) (both addressing "Liabilities arising out of or in connection with any Action . . . relating to the development, manufacture, packaging, labeling, production, delivery, sale, resale, distribution, marketing, promotion, use or consumption of, or exposure to, tobacco products, including **smoking and health-related** claims, . . . related to one or more of the Acquired Tobacco Cigarette Brands" (emphasis added)).

[99] *Id.* § 2.01(c)(v).

[100] *Id.* § 2.01(d)(i).

alleged addiction of one or more individuals."[101]  It repeats the clarifying examples

listed in § 2.01, including "smoking and health-related claims."[102]  It assigns pro rata

to ITG and Reynolds any liabilities arising from an "Action" related to both the pre-

and post-closing periods.[103]  Because the 2017 Action was not "brought in relation

to the alleged personal injury or other damage to person(s) caused by smoking or

alleged addiction," it is not a "smoking and health-related claim" within the meaning

of § 11.01(a)(v)(A).[104]

---

[101] *Id.* § 11.01(a)(v)(A) (stating "where the Action is brought in relation to the alleged personal injury or other damage to person(s) caused by smoking or alleged addiction of one or more individuals to one or more of the Acquired Tobacco Cigarette Brands, [Reynolds' indemnification] shall extend to the pro-rata portion of all Losses arising out of or in connection with such Action (to the extent relating to the development, manufacture, packaging, labeling, production, delivery, sale, resale, distribution, marketing, promotion, use or consumption of, or exposure to, tobacco products, ***including smoking and health-related claims*** and related to one or more of the Acquired Tobacco Cigarette Brands) calculated on the basis of . . . [a formula]" (emphasis added)).

[102] *Id.* The phrase "smoking and health-related claims" modifies the phrase "Losses associated with such Action." *Id.*  In other words, a "smoking and health-related claim" is an example of a "Liability" associated with an "Action" that is "brought in relation to the alleged personal injury or other damage to person(s) caused by smoking or alleged addiction." *Id.*

[103] *Id.*

[104] The pro rata allocation formula prescribed by § 11.01(a)(v)(A) is also incompatible with viewing a contract action (like the 2017 Action) as involving "smoking and health-related claims."  The formula in § 11.01(a)(v)(A) defines a ratio of "(1) the period of time such individual or individuals used, consumed or were exposed to tobacco products relating to one or more of the Acquired Tobacco Cigarette Brands prior to the Closing Date" and "(2) the total period of time such individual or individuals used, consumed or were exposed to tobacco products relating to one or more of the Acquired Tobacco Cigarette Brands." *Id.* § 11.01(a)(v)(A).  The "Losses" associated with the 2017 Action have no relation to the

This interpretation of "smoking and health-related claim" is consistent with subsection (B) of § 11.01(a)(v), which is a catch-all for "any claim other than [that] set out in Section 11.01(a)(v)(A)."[105]  In repeating the lists of exemplars from § 2.01, § 11.01(a)(v)(B) omits the phrase "including smoking and health-related claims."[106]  That is, "any . . . other" claim does not include a "smoking and health-related claim."[107]  A claim involving "alleged personal injury or other damage to persons caused by smoking or alleged addition" could be a "smoking and health-related claim," but a claim lacking such conduct is not. By that logic, the characterization of "smoking and health-related claims" in § 11.01(a)(v)(A) would not apply to the 2017 Action.

---

"period of time such individual or individuals used, consumed or were exposed to tobacco products." *Id.*

[105] *Id.* § 11.01(a)(v)(B) (stating "where the Action relates to any claim other than set out in Section 11.01(a)(v)(A) above, [Reynolds' indemnification] shall extend to the pro-rata portion of all Losses arising out of or in connection with such Action (to the extent relating to the development, manufacture, packaging, labeling, production, delivery, sale, resale, distribution, marketing, promotion, use or consumption of, or exposure to, tobacco products and related to one or more of the Acquired Tobacco Cigarette Brands), as follows: . . . [a formula]").

[106] *Id.*

[107] In addition, the pro rata calculation formula prescribed by § 11.01(a)(v)(B) recognizes that non-"smoking and health-related claims" have no relation to the duration of exposure to tobacco products. *Id.* § 11.01(a)(v)(B).  Instead, this formula uses a ratio of sales.

29

The definition of Straddle Liabilities reinforces this reading. [108] Like §§ 2.01(c)(v), 2.01(d)(i), and 11.01(a)(v), the definition begins by listing conduct that might give rise to a "smoking and health related" action.[109] The definition then adds a proviso, which "conditions the principal matter it qualifies."[110] The proviso lists four instances where Losses from an "Action" that generated a Straddle Liability are nonetheless excluded.[111] Three of the four instances involve scenarios specific to products liability actions involving ITG's post-closing conduct: where

---

[108] *See* APA Ex. A at A-17.

[109] "[S]moking and health-related claims" are a subset of the claims "relating to" manufacture, use, consumption, etc. of tobacco products. *See* APA §§ 2.01(c)(v), 2.01(d)(i), 11.01(a)(v)(A). The definition of Straddle Liabilities omits "development" and "production." APA Ex. A at A-17. The provisions are otherwise consistent in this regard.

[110] 2017 Op. at *8 (citation omitted).

[111] The full text of the proviso is: "Straddle Tobacco Action Liabilities will exclude any Losses of RAI and its Affiliates arising solely in relation to the Straddle Tobacco Action Period to the extent that any such Losses were incurred as a result of any of the following (whether by way of an increase to an existing Straddle Tobacco Action Liability or as a separate Straddle Tobacco Action Liability): (a) any changes in Law (or interpretation thereof) after the Closing Date; (b) any manufacturing defects or design defects in any of the products relating to the Acquired Tobacco Cigarette Brands that were manufactured by or on behalf of the Acquiror (other than by RAI or its Affiliates on behalf of the Acquiror (other than by RAI or its Affiliates on behalf of the Acquiror, where RAI or its Affiliates are responsible for any such defects) after the Closing Date; (c) the marketing of the Acquired Tobacco Cigarette Brands by or on behalf of the Acquiror to, or otherwise targeted at, minors after the Closing Date; or (d) any misrepresentation or untrue statement of fact made by the Acquiror after the Closing Date in relation to the Acquired Tobacco Cigarette Brands, save to the extent that any of such matters were materially consistent with the products or the practices of RAI or Lorillard in the twelve month period prior to Closing." APA Ex. A at A-17.

the "Liability" arises from "manufacturing defects or design defects" introduced by ITG, "marketing" by ITG, or "misrepresentations" by ITG.[112] Neither the proviso's scenarios nor § 11.01(a)(v)(A) concern breaches of contract like those challenged in the 2017 Action.

This more limited reading of the Straddle Liabilities definition is temporally reasonable in view of § 2.01(d)(v). Section 2.01(d)(v) assigns liability for post-closing "smoking and health-related Actions" where ITG and Reynolds face liability for pre- and post-closing conduct, respectively—i.e., conduct that "straddled" the closing date.[113] For example, an individual's health problems from cigarette use could involve latency periods. The relevant conduct might have occurred—at least in part—pre-closing when Reynolds owned the Acquired Brands, but an associated claim could be filed after ITG took ownership. The parties agreed in § 2.01(d)(v) that, for a limited period post-closing (i.e., the eight-year Straddle Tobacco Action Period), Reynolds would bear all liabilities arising from such actions. To conclude otherwise would lead to the absurd result described in the 2022 Opinion, whereby

---

[112] *Id.* The fourth instance involves post-closing "changes in Law (or interpretation thereof)." *Id.*

[113] The phrase "Seller Tobacco Liabilities" modifies the phrase "such *Action*" that, in turn, refers back to "any smoking and health related *Action* filed in the Straddle Action Period"—the only other "Action" mentioned in the definition of Straddle Liabilities. *Id.* (emphasis added); *see supra* note 60 and accompanying text.

31

ITG would own, sell products under, and derive the benefits of the APA while Reynolds remains obligated to make annual payments to Florida for ITG's sales without indemnification from ITG.[114]

Finally, to treat the Florida Judgment Liabilities as a Straddle Liability would render § 2.01(c)(vii) meaningless. ITG agreed in § 2.01(c)(vii) to assume "all Liabilities under the State Settlements" "subject to the Agreed Assumption Terms."[115] If ITG's view of Straddle Liabilities were adopted, § 2.01(c)(vii) would not have that effect for any Action filed in the Straddle Tobacco Action period. Rather, any liabilities resulting from the "State Settlements" would fall within the

---

[114] 2022 Op. at *19 ("No reasonable tobacco manufacturer would have agreed to expose itself to the prospect of making annual payments to [Florida] for cigarette product revenues it no longer receives."); *see also* 2017 Op. at *12.

[115] APA § 2.01(c)(vii) (agreeing to assume "subject to the Agreed Assumption Terms, all Liabilities under the State Settlements in respect of the Acquired Tobacco Cigarette Brands that relate to the period after the Closing Date, including (A) any recalculation or redetermination of amounts due in respect of the Acquired Tobacco Cigarette Brands that relate to the period after the Closing Date, and (B) all plaintiffs' attorneys' fees attributable to any post-Closing increases in volume of sales (determined in accordance with Section 11.08) of any of the Acquired Tobacco Cigarette Brands, but excluding, for the avoidance of doubt, Seller Plaintiff Fees"). The "State Settlements" are those reached between Reynolds Tobacco and other manufacturers, on one hand, and the States of Florida, Minnesota, Mississippi, and Texas, on the other. 2022 Op. at *2.

Straddle Liabilities exception.[116] Delaware courts "will not read a contract to render a provision or term 'meaningless or illusory.'"[117]

*         *         *

Accordingly, even if ITG's argument were fairly presented, the Florida Judgment Liability is not a Straddle Liability. It is not an Excluded Liability under § 2.01(d)(v). Rather, it is—as I previously held in the 2022 Opinion—an Assumed Liability. To treat the Florida Judgment Liability, which involves Annual Payments for ITG's sales of the Acquired Brands, as a Straddle Liability would be inconsistent with the bargained-for assignment of liabilities prescribed in the APA.

ITG's motion for summary judgment on this basis is denied. Reynolds' motion for summary judgment on its entitlement to indemnification for the settlements payments made to Florida as part of the Florida Judgment Liability is

---

[116] *See* APA § 2.01(c)(v).

[117] *Osborn*, 991 A.2d at 1159 (quoting *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)). It would also be unreasonable to assign liability under a "State Settlement" based only on the filing date of an action related to that settlement. For example, had Florida's motion to enforce the Florida Settlement Agreement been filed on June 13, 2023—one day after the Straddle Tobacco Action Period—the motion would not give rise to a Straddle Liability under ITG's interpretation. But if the motion were filed on June 12, 2023, it would give rise to a Straddle Liability.

granted.[118]  The amount of Reynolds' entitlement will be resolved after trial, subject to any appropriate reductions proven by ITG.[119]

### 2. Whether the Florida Attorneys' Fees Are Indemnifiable

The Florida court held that Florida was "entitled to an award of its reasonable attorneys' fees and costs from Reynolds under the express terms of the Florida Settlement Agreement." [120]   Reynolds seeks indemnification for the resulting $3,235,000 it paid for Florida's attorneys' fees and costs in the 2017 Action (previously defined as the "Florida Attorneys' Fees").[121]  Indemnification is not available for the Florida Attorneys' Fees because they are not indemnifiable Losses under the APA.

The definition of Losses includes "interest and penalties recovered by a third party with respect [to claims, etc.]" and "out-of-pocket expenses *and reasonable attorneys'* [] *fees* . . . incurred in the investigation or defense of any of the same in asserting, preserving or enforcing [Reynolds'] *rights hereunder*[.]" [122]   This

---

[118] This holding excludes the Florida Attorneys' Fees and Florida Judgment Interest, which are addressed separately below.

[119] *See infra* Section II.B.1.

[120] Fla. J. ¶ 7.

[121] *Id.*; *see supra* notes 30-31; Reynolds' Opening Br. Ex. M.

[122] APA Ex. A at A-10 ("'Losses' means all losses, demands, claims, Actions, assessments, Liabilities, damages, deficiencies, fines, penalties, costs, expenses, commitments, judgments, orders, decrees or settlements, environmental investigation and remediation

provision explicitly includes "interest and penalties recovered by a third party" (like Florida), but not third-party attorneys' fees. Where "several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded."[123] Attorneys' fees are addressed later in the provision regarding Reynolds' Losses in "asserting, preserving or enforcing [its] rights hereunder" (i.e., under the APA).[124]

Section 11.02(a)(vi) likewise does not support indemnification of the Florida Attorneys' Fees. ITG must indemnify Reynolds for Losses including Reynolds' "reasonable attorneys' [] fees . . . incurred in . . . asserting, preserving, or reinforcing [Reynolds'] rights hereunder."[125] The Florida Attorneys' Fees were not incurred by Reynolds in enforcing its rights against ITG under the APA. They were incurred by

---

costs, obligations and claims (including any Action brought by any Governmental Authority or Person), in each case whether or not resulting from Third Party Claims, ***interest and penalties recovered by a third party with respect thereto*** and out-of-pocket expenses and ***reasonable attorneys'*** and accountants' ***fees and expenses incurred*** in the investigation or defense of any of the same ***in asserting, preserving or enforcing any Acquiror Indemnified Party's or RAI Indemnified Party's rights hereunder*** (emphasis added)).

[123] *Active Asset Recovery, Inc. v. Real Est. Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999)) (quoting Arthur L. Corbin, 3 Corbin on Contracts § 552 at 206 (1960)).

[124] APA Ex. A at A-10.

[125] APA § 11.02(a)(vi).

Florida in asserting its own rights "under the express terms of the Florida Settlement Agreement."[126]

Reynolds is therefore not entitled to indemnification for the Florida Attorneys' Fees under the APA. ITG's motion for summary judgment on this basis is granted; Reynolds' is denied.

### 3. Whether the Florida Judgment Interest Is Indemnifiable

Reynolds also seeks indemnification of certain pre- and post- judgment interest it paid to Florida on damages arising out of the Florida Judgment Liability (previously defined as the Florida Judgment Interest).[127] This interest relates to Annual Payments owed to Florida for 2015 through 2019 that were unpaid until October 5, 2020. As discussed above, the definition of indemnifiable Losses includes "interest and penalties recovered by a third party."[128] The Florida Judgment Interest that Reynolds was required to pay Florida falls squarely within that definition.

---

[126] Fla. J. ¶ 7 ("As the prevailing party, the State is entitled to an award of its reasonable attorneys' fees and costs from Reynolds under the express terms of the Florida Settlement Agreement"); *see also* Fla. Settlement Agreement Amend. No. 1 Ex. 1 (Dec. 7, 1998 Consent Decree) ¶ 9 ("Enforcement and Attorneys' Fees. In any proceeding which results in a finding that a [] Settling Defendant violated this Consent Decree, the responsible [] Settling Defendant or [] Settling Defendants shall pay the State's costs and attorneys' fees incurred in such proceeding.").

[127] *See supra* note 20 (defining Florida Judgment Interest).

[128] APA Ex. A at A-10; *see supra* note 122.

ITG contends that Reynolds cannot recover the Florida Judgment Interest because it "resulted from Reynolds' own breach of the Florida Settlement Agreement and decision to delay payment."[129] In support of its argument, ITG construes the definition of Losses as providing that "interest and penalties" must be "incurred . . . in asserting, preserving or enforcing" Reynolds' rights under the APA.[130] But the phrase "incurred . . . in asserting, preserving or enforcing [the party's] rights hereunder" modifies "reasonable attorneys' . . . fees and expenses."[131] It does not modify "interest and penalties recovered by a third party with respect thereto," which refers back to "all . . . Actions . . . damages . . . or settlements."[132] In other words, Reynolds' indemnifiable Losses for attorneys' fees and expenses are those incurred in vindicating its rights under the APA. But interest and penalties

[129] ITG's Opening Br. 32. ITG also argues that Reynolds' entitlement to indemnification for the Florida Judgment Interest should be rejected because Reynolds employed a "failed litigations strategy" by withholding "payment from June 12, 2015 [i.e., closing] until October 5, 2020." *Id.* at 33. But Reynolds was entitled to appeal the ruling in Florida and, when its appeals were exhausted, then pay the debt imposed by the Florida Judgment. The interest that Reynolds paid to Florida is a direct result of the Florida Judgment. Nothing in the APA is to the contrary.

[130] ITG Brands, LLC's Reply Br. in Supp. of Mot. for Summ. J. on Remedies (Dkt. 362) 32 (quoting APA Ex. A at A-10).

[131] APA Ex. A at A-10; *see supra* note 122.

[132] APA Ex. A at A-10.

paid to a third party—like Florida—are recoverable in a broader set of circumstances, subject to the provisions of § 11.02.[133]

My reading is consistent with the last antecedent rule: "ordinarily, qualifying words or phrases, where no contrary intention appears, usually relate to the last antecedent."[134] The verb "incurred" and the phrase "in asserting, preserving or enforcing" attach solely to the phrase "reasonable attorneys' and accountants' fees and expenses."[135] This interpretation of Losses is reasonable based on the plain text of the definition. The term "and" following "thereto" denotes a separation between "all losses, demands, claims . . . including interest and penalties recovered by a third party with respect thereto" "*and*" "out-of-pocket expenses and reasonable attorneys' and accountants' fees and expenses incurred in . . . asserting . . . rights hereunder."[136]

As a result, ITG's argument that the Florida Judgment Interest is not indemnifiable is belied by the APA's terms. Summary judgment on Reynolds' entitlement to indemnification for the Florida Judgment Interest is granted in Reynolds' favor. ITG's cross-motion for summary judgment on this basis is denied.

---

[133] *See id.* at A-10; APA § 11.02 (Indemnification by the Acquiror).

[134] *Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at *4 (Del. Ch. Dec. 7, 1999) (citation omitted); *see also Hawkins v. Daniel*, 273 A.3d 792, 825 (Del. Ch. 2022), *aff'd*, 289 A.3d 631 (Del. 2023).

[135] APA Ex. A at A-10.

[136] *Id.* (emphasis added).

The amount that Reynolds can recover for the Florida Judgment Interest will be set post-trial.

### 4. Whether the Delaware Attorneys' Fees Are Indemnifiable

Reynolds seeks indemnification for approximately $7.4 million of fees and costs it has incurred in the Delaware litigation (previously defined as the Delaware Attorneys' Fees). ITG raises two objections to Reynolds' request. One can be dispensed of now; the other cannot.

First, ITG argues that Reynolds waived its claim for the Delaware Attorneys' Fees by failing to adduce evidence of them.[137] Under Rule 56, Reynolds is permitted to move for "summary judgment . . . as to all or any part [of its claims]."[138] Reynolds moved only on its entitlement to recover the Delaware Attorneys' Fees. It was not required to prove a specific amount of its fees at this stage.[139]

If Reynolds succeeds in proving its entitlement to the Delaware Attorneys' Fees, it may submit a Rule 88 affidavit. Once Reynolds files a fee application, ITG

---

[137] Separately, ITG filed a motion to compel Reynolds to produce evidence supporting its request for the Delaware Attorneys' Fees. Dkt. 349.

[138] Ch. Ct. R. 56(b).

[139] The cases ITG cites to argue otherwise arise in the context of jury trials. *See Fed. Agric. Mortg. Corp. v. It's A Jungle Out There, Inc.*, 2006 WL 1305212, at *2 (N.D. Cal. May 9, 2006) (requiring the amount of attorneys' fees to be proven at trial because "the determination of the recoverable fees must be made by the trier of fact") (citation omitted). This court's typical practice—sans jury—allows a party to submit a Rule 88 affidavit to resolve the amount of fees after its entitlement to fees as a general matter is shown.

will have the opportunity to address the reasonableness of Reynolds' requested fees.[140] This approach is efficient: if Reynolds does not prove its entitlement to fees, further proceedings on the amount are moot.

Second, ITG avers that the Delaware Attorneys' Fees are "Seller Plaintiff Fees," which are not indemnifiable.[141] Reynolds, in turn, argues that ITG's contractual obligation in § 11.02(a) to "indemnify, defend, and hold [Reynolds] harmless" necessarily includes fees incurred to enforce its indemnity rights.[142] Reynolds insists that the Delaware Attorneys' Fees are not Seller Plaintiff Fees.

The APA contemplates two types of "Plaintiff Fees": Seller Plaintiff Fees that are Excluded Liabilities under § 2.01(d)(ix); and "Assumed Plaintiff Fees" that are Assumed Liabilities under § 2.01(c)(vii).[143] Seller Plaintiff Fees are "all plaintiffs' attorneys' fees . . . in relation to the State Settlements in respect of the Acquired Tobacco Cigarette Brands, relating to any periods . . . excluding. . . Assumed Plaintiff Fees."[144] Assumed Plaintiff Fees include "all plaintiffs' attorneys' fees

---

[140] Under the APA, attorneys' fees are limited to those that are "reasonable." APA Ex. A at A-10 (defining "Losses"). Even where a fee-shifting provision does not explicitly limit attorneys' fees to those that are "reasonable," a court will review the fees for reasonableness. *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 244-45 (Del. 2007).

[141] ITG's Opening Br. 37.

[142] Reynolds' Opening Br. 14-15 (citing cases).

[143] APA §§ 2.01(c)(vii), (d)(ix); APA Ex. A at A-16.

[144] APA Ex. A at A-16.

attributable to any post-Closing increases in volume of sales . . . of any of the Acquired Tobacco Cigarette Brands, but excluding . . . Seller Plaintiff Fees."[145]

Reynolds argues that the Seller Plaintiff Fees are "not fees incurred by any plaintiff in any litigation relating to the state settlements."[146] Rather, it says that the phrase "plaintiffs' attorneys' fees" used in the definition of Seller Plaintiff Fees refers to "private outside counsel who represented the States as plaintiffs in the underlying lawsuits leading to the state settlements." [147] Reynolds relies on descriptions of a Florida Fee Payment Agreement in the Florida litigation record to support its logic.[148] But that agreement does not appear to be part of the record before me.

---

[145] APA § 2.01(c)(vii).

[146] Reynolds' Reply Br. 48.

[147] *Id.* at 46-47.

[148] *See id.* at 47 (citing Reynolds' Opening Br. Ex. N); Reynolds' Opening Br. Ex. N at 2 & n.4 (Florida court explaining: "As discussed in greater detail below, pursuant to the Florida Agreement and as implemented by a September 11, 1998 agreement called 'Florida Fee Payment Agreement,' Florida also receives substantial annual payments from the tobacco-parties as payment for plaintiffs' private-sector attorneys based on the same proportion [as the Florida Settlement Agreement]."); *R.J. Reynolds Tobacco Co. v. State*, 301 So. 3d 269, 272 (Fla. Dist. Ct. App. 2020) ("Merged as part of the FSA was a Florida Fee Payment Agreement, in which the Settling Defendants agreed to pay Florida's attorneys' fees. The fees due and owing would be made by the Settling Defendants in pro rata proportion to their respective Market Share, just like the method outlined in the FSA."); Fla. Settlement Agreement § V ("Settling Defendants agree to pay, separate and apart from the above, reasonable attorneys' fees to private counsel."); Fla. Settlement Agreement Amend. No. 1 ¶ 26 ("Settling Defendants, the State of Florida and certain private counsel for the State of Florida have entered into a separate agreement on

41

ITG fares no better. It contends that the Delaware Attorneys' Fees fall within the definition of Seller Plaintiff Fees because they were paid by Reynolds "as a plaintiff" in this litigation.[149] But ITG makes no attempt to explain how the phrase "plaintiffs' attorneys'" unambiguously leads to that conclusion, especially considering that Reynolds is nominally the defendant and counter-plaintiff here.

Simply put, the briefing is wanting. Because of the incomplete record and briefing before me, I cannot grant summary judgment in either party's favor.[150] Reynolds' entitlement to indemnification for the Delaware Attorneys' Fees must be resolved after trial.

## B. ITG's Arguments to Reduce Reynolds' Damages

ITG raises several bases to eliminate or reduce Reynolds' principal damages. It seeks a determination that Reynolds' damages must be reduced because of a favorable Profit Adjustment allocation compared to Reynolds' liability if ITG had joined the Florida Settlement Agreement. It also opposes Reynolds' motion for

---

September 11, 1998 (the 'Florida Fee Payment Agreement') that sets forth the entire obligation of Settling Defendants with respect to payment of attorneys' fees pursuant to section V of the Settlement Agreement.").

[149] ITG's Opening Br. 37.

[150] *See Great Hill*, 2017 WL 3168966, at *2 ("[T]he court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application.").

summary judgment by arguing that Reynolds cannot recover for Losses caused by Reynolds' own or third-party conduct, and that Reynolds acquiesced, materially breached the APA, or failed to mitigate damages.

ITG is not entitled to summary judgment on its Profit Adjustment argument, which will be taken up after trial. Its other defenses are deficient and provide no grounds to deny Reynolds' right to a recovery under the APA.

      1.    <u>Whether Reynolds' Damages Should Reflect Any Profit Adjustment Benefit</u>

Reynolds seeks indemnification for the volume-related settlement payments (the Annual Payment with Volume Adjustment) attributable to sales of the Acquired Brands from closing to 2021. These payments, Reynolds contends, total over $198 million. Reynolds does not seek indemnification for any portion of the Profit Adjustment.[151]

ITG argues that Reynolds has saved millions of dollars in Profit Adjustment payments because of ITG's non-joinder in the Florida Settlement Agreement. According to ITG, these savings should be deducted from the amount of Reynolds' principal damages. Reynolds disagrees.

---

[151] Reynolds' Opening Br. 9.

Resolving this dispute involves three interrelated questions. First, whether ITG's non-joinder allowed Reynolds to pay a smaller proportion of the Profit Adjustment. Second, whether Reynolds' damages should be reduced by any amount it saved from ITG's non-joinder. And third, the amount of any reduction (if appropriate).

These are mixed questions of law and fact. Arguably, I could determine as a general legal matter whether Reynolds' indemnification award should be offset by avoided costs or losses to avoid a windfall.[152] But that analysis would be premature given the factual disputes over whether Reynolds would have paid Florida a greater amount of Profit Adjustment if ITG joined the Florida Settlement Agreement. Accordingly, I defer the resolution of ITG's argument until a fuller record at trial can put it in context.

### 2. Whether Reynolds is Barred From Recovering Losses Caused By Its Own or Third-Party Conduct

ITG argues that Reynolds' Losses were not caused by the Florida Judgment but by the conduct of Reynolds, Florida, and Philip Morris.[153] Under § 11.02(a)(vi) of the APA, ITG must indemnify Reynolds for "all Losses" that Reynolds "may

---

[152] *See, e.g.*, *O'Brien v. IAC/Interactive Corp.*, 2010 WL 3385798, at *17-18 (Del. Ch. Aug. 27, 2010), *aff'd*, 26 A.3d 174 (Del. 2011); *see generally Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440 (3d Cir. 1996).

[153] ITG's Opening Br. 47-52; ITG's Reply Br. 21-27.

suffer or incur, or become subject to, *as a result of* . . . any Assumed Liability."[154] ITG interprets the phrase "as a result of" to require a showing of causation between the Losses incurred and the Florida Judgment Liability. It avers that a genuine issue of material fact exists "regarding what Losses, if any, Reynolds suffered 'as a result of' ITG's conduct."[155]

ITG's argument does not prevent the entry of summary judgment in Reynolds' favor on Reynolds' entitlement to recover the Florida Judgment Liability. Causation is irrelevant to ITG's indemnification obligations under § 11.02(a)(vi). The plain text of the provision addresses whether the Losses resulted from "any Assumed Liability."[156] It does not contemplate a subsidiary inquiry into the factors that brought about the Assumed Liability itself.

The Florida Judgment Liability is an Assumed Liability.[157] Reynolds' payments to Florida—i.e., the Losses Reynolds seeks indemnification for—were

---

[154] APA § 11.02(a)(vi) (stating that ITG must indemnify Reynolds and its affiliates "against all Losses . . . as a result of . . . (vi) any Assumed Liability (including the failure of the Acquiror to perform or in due course pay and discharge any such Assumed Liability), including any Liability expressly assumed by the Acquiror pursuant to Exhibit D hereof, and any Acquiror Tobacco Liability and the portion of any Losses determined to be an Acquiror Tobacco Liability pursuant to Section 11.01(a)(v)") (emphasis added).

[155] ITG's Opening Br. 47.

[156] APA § 11.02(a)(vi).

[157] *See supra* note 60; 2022 Op. at *20.

incurred as a result of that liability. Whether the Florida Judgment was brought about because of Reynolds, Philip Morris, Florida, or ITG's conduct (or non-conduct) is inconsequential. ITG's indemnification obligation under § 11.02(a) arises because the Florida Judgment Liability exists and ITG agreed to indemnify Reynolds for Losses resulting from it.[158]

### 3. Whether Reynolds' Purported Breaches of the APA Preclude Indemnification

ITG maintains that it is relieved of any duty to indemnify Reynolds because of Reynolds' own "material antecedent breach" of the APA.[159] It points to three contractual duties that Reynolds purportedly breached. First, Reynolds' obligation to "assist[] and cooperate[]" with ITG's efforts to reach agreement with Florida.[160]

---

[158] *See* 2022 Op. at *19 ("[T]he amounts Reynolds Tobacco has paid (and will pay) due to the Florida Judgment are Losses for which ITG must indemnify Reynolds."). At times, ITG suggests that its causation argument is based not on the APA but on a provision of the Florida Judgment that Reynolds "will remain liable" for making future payments based on ITG's sales "unless and until ITG becomes a Settling Defendant." Fla. J. ¶ 4; *see* ITG's Opening Br. 50-51. Yet ITG's causation arguments center on conduct in 2015 and 2016— years before the Florida Judgment. ITG's Opening Br. 47-48, 50-51. It is not apparent how conduct pre-dating the Florida Judgment could be an intervening cause of Reynolds' Losses under an APA provision concerning future events.

[159] ITG's Opening Br. 54-56. ITG previously made this argument in its summary judgment briefing on liability. ITG Brands, LLC's Opp. to Defs.' Mot. for Summ. J. (Dkt. 249) 59 (arguing that Reynolds' breaches of the APA preclude summary judgment for Reynolds); *see also* Defs.' Reply in Supp. of Their Mot. for Summ. J. (Dkt. 257) 31-32 (responding to ITG's argument). ITG's attempt to relitigate this issue is procedurally improper. Summary judgment on liability was granted for Reynolds. Regardless, the argument also fails on the merits, as discussed above.

[160] APA Ex. F (Agreed Assumption Terms) § 2.2; *see* ITG's Opening Br. 55.

46

Second, Reynolds' duty to keep ITG informed of and ensure ITG's participation in discussions with Florida and Philip Morris about joinder to the Florida Settlement Agreement.[161] And third, Reynolds' obligation to use "reasonable best efforts" to obtain third-party consents necessary for ITG to assume obligations under the settlement.[162]

"A party is excused from performance under a contract if the other party is in material breach thereof."[163] This principle is an ill fit for ITG's argument. ITG attempts to frame its indemnification obligation as a future duty it has yet to perform under the APA.[164] But it is obligated "to assume and thereafter to pay, discharge

---

[161] APA § 6.20 ("Each of the Acquiror and RAI further undertakes from and after the Closing, to take and to cause each of its Affiliates and each of its and their respective Representatives to take all such steps as are necessary or expedient (including giving any relevant waivers and/or consents and/or engaging in or cooperating in any disputes, litigation or arbitration) to cause the Agreed Assumption Terms, as applicable, to become fully effective and binding on each of the States. Each of the Parties shall, and shall cause each of its respective Affiliates and each of its and their respective Representatives to, keep each other fully informed and fully support each other in relation to all material communications made, positions maintained and other steps taken under this Section 6.20.").

[162] *Id.* § 6.04(e).

[163] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *13 (Del. Ch. Jan. 25, 2013).

[164] Restatement (Second) of Contracts § 237 (Am. L. Inst. 1981) ("Except as stated in § 240, it is a condition of each party's *remaining duties* to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." (emphasis added)); 23 Williston on Contracts § 63:3 (4th ed. 2009) ("Otherwise stated, a nonperforming party is liable for any breach of contract, but the other party is discharged from *further*

47

and perform" the "Assumed Liabilities"—such as the Florida Judgment Liability—"effective as of the Closing."[165]  Put differently, ITG's indemnification obligation is the measure of damages for ITG's failure to undertake an Assumed Liability.[166]  As the Restatement (Second) of Contracts explains, the prior material breach doctrine affects "duties to render performance" but does not discharge "[a] claim for damages that has already arisen as a result of a claim for partial breach."[167]

For these reasons, ITG's argument that Reynolds materially breached the APA does not prevent the entry of summary judgment in Reynolds' favor on Reynolds' entitlement to indemnification for the Florida Judgment Liability.

> 4.  Whether Reynolds' Recovery Is Precluded by the Doctrine of Acquiescence

ITG argues acquiescence as an affirmative defense. According to ITG, Reynolds acquiesced in—and even advocated for—ITG's position that ITG could

---

*performance*, and is entitled to substantial damages, only when there is a material breach." (emphasis added)).

[165] APA § 2.01(c).

[166] *See Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *3 (Del. Ch. Jan. 24, 2005) ("The term 'Indemnification' is used here as a contractual term of art to describe [a] contractual remedy.").

[167] Restatement (Second) of Contracts § 237 (Am. L. Inst. 1981), cmt. e ("A contracts to build a building for B. B delays making the site available to A, giving A a claim against B for damages for partial breach.  A then commits a material breach and B properly cancels the contract.  B has a claim against A for damages for total breach, but A still has a claim against B for damages for partial breach.").

only assume the Florida Judgment Liability under § 2.01(c)(vii) of the APA.[168]  This

argument is legally and factually groundless.

"A claimant is deemed to have acquiesced in a complained-of act where" the

claimant:

> has full knowledge of his rights and the material facts and (1) remains
> inactive for a considerable time; or (2) freely does what amounts to
> recognition of the complained of act; or (3) acts in a manner
> inconsistent with the subsequent repudiation, which leads the other
> party to believe the act has been approved.[169]

"For the defense of acquiescence to apply, conscious intent to approve the act is not

required, nor is a change of position or resulting prejudice."[170]  As the party asserting

the defense, ITG bears the burden of proving its elements.

As an initial matter, ITG identifies no "complained-of act" in which Reynolds

supposedly acquiesced.[171]  At most, it avers that Reynolds acquiesced in an idea:

"ITG's position" and "ITG's interpretation" of the APA.[172]  ITG offers no support

---

[168] ITG's Opening Br. 42-47; ITG's Reply Br. 30-32.

[169] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014).

[170] *Id.*

[171] *Id.*

[172] ITG's Opening Br. 42, 45.

for applying the defense in this amorphous way. Delaware courts routinely discuss acquiescence in *acts*.[173]

Even if acquiescence in a position or idea were possible, ITG has not demonstrated that any of the three subsidiary elements of the defense are met.

Regarding the first subsidiary element, ITG has not shown that Reynolds remained inactive for a considerable time after learning ITG's position. ITG argues that Reynolds was passive for five years before asserting that ITG assumed the Florida Judgment Liability under §§ 2.01(c)(iv), (c)(v), and (c)(vii).[174] In Reynolds' March 24, 2017 counterclaims, however, it broadly pleaded that ITG assumed the Florida Judgment Liability under the APA, without limitation to any specific provision of the APA.[175]

---

[173] *E.g.*, *Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys., Inc.*, 2015 WL 2400712, at *2 (Del. Ch. May 19, 2015) (describing acquiescence as a "doctrine focused on the" defendant's understanding "that complained-of acts were acquiesced in"); *Lehman Brothers Hldgs., Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430 (Del. Ch. Feb. 25, 2014) (holding that a defendant acquiesced in the incurrence of debt), *aff'd*, 105 A.3d 989 (Del. 2014); *Klaassen*, 106 A.3d at 1047-48 (concluding that the defendant had acquiesced in the boards' acts to remove him as chief executive officer); *Simple Glob., Inc. v. Banasik*, 2021 WL 2587894, at *13 (Del. Ch. June 24, 2021) (holding that the defendant acquiesced in a stock transfer when he led others "to believe the act had been approved").

[174] ITG's Opening Br. 43.

[175] Defs.' Answer and Verified Counterclaims (Dkt. 30) ("Answer") ¶¶ 116-24. This filing was made just two months after Florida moved to enforce in the 2017 Action. ITG suggests that Reynolds somehow "acquiesced in ITG's interpretation that the settlement liabilities are exclusively governed by § 2.01(c)(vii) and the Agreed Assumption Terms" by citing to those provisions in an earlier part of Reynolds' counterclaims. ITG's Opening Br. 45 (citing Answer ¶¶ 102-10). This argument ignores Counterclaim III in which Reynolds

50

ITG also suggests that Reynolds remained silent during the negotiation of the APA and between signing and closing when ITG communicated its understanding that—absent joinder—ITG would not be liable for settlement payments.[176] But a party can hardly acquiesce in losing a contract right before the contract exists. And post-signing, the only communication ITG cites concerns whether ITG would be liable under any settlement agreements—not whether ITG would be required by the APA to indemnify Reynolds' payments linked to ITG's post-closing sales of the Acquired Brands.

Regarding the second and third subsidiary elements, ITG has not shown that Reynolds expressed its agreement with ITG's position on assumption obligations or acted in a manner inconsistent with its repudiation of ITG's position. ITG points to Reynolds' opposition to Florida's and Philip Morris' motions to enforce the Florida Settlement Agreement in the 2017 Action.[177] There, Reynolds argued that "[w]ith respect to the Florida Settlement Agreement . . . neither the APA nor the Agreed Assumption Terms nor any Closing Document purports to assign [Reynolds']

argued that ITG assumed the Florida Judgment Liability under the APA. Answer ¶¶ 116-24. Nor is it clear how Reynolds' reliance on different APA provisions at times in this litigation amounts to acquiescence in ITG's interpretation that a certain provision of the APA is operative.

[176] ITG's Opening Br. 43-44 (discussing ITG's striking of redlines and asking Reynolds whether it disagreed, to which Reynolds was silent).

[177] ITG's Liability Br. Ex. 14 at 42.

settlement obligations to ITG."[178]  ITG also references Reynolds' argument in appealing the Florida Judgment that "[t]he APA transferred only assets to ITG, not rights or obligations under the [Florida Settlement Agreement]."[179]

Reynolds' arguments in Florida are not inconsistent with its present position that ITG assumed the Florida Judgment Liability under the APA.  In the Florida litigation, Reynolds was arguing that ITG could assume Reynolds' settlement obligations to Florida under the Florida Settlement Agreement through joinder.  It further argued that under the APA, ITG was only required to use reasonable best efforts to join the Florida Settlement Agreement.  Reynolds' arguments here concern a different matter: allocation of the Florida Judgment Liability between ITG and Reynolds under the APA.

Reynolds argued, in the Florida litigation, that neither it nor ITG was liable to Florida. But Reynolds has consistently maintained that if it is held liable for payments based on ITG's sales of Acquired Brands cigarettes, ITG assumed that

---

[178] *Id.* ("Rather, ITG agreed to use its reasonable best efforts to join the Florida Settlement Agreement.").

[179] ITG's Liability Br. Ex. 17 at 7 ("The APA's requirement that ITG use its 'reasonable best efforts' to join the [Florida Settlement Agreement] confirms the absence of an affirmative assignment of rights or liabilities under the [Florida Settlement Agreement] to ITG in the absence of such a joinder.").

liability under the APA.[180]  The contrary position would be a self-defeating one that no reasonable litigant would advance—let alone acquiesce to—it.[181]

     5.     <u>Whether Reynolds' Recovery Is Limited By Failure to Mitigate Losses</u>

The duty to mitigate prohibits "a party [from] recover[ing] damages for loss that he could have avoided by reasonable efforts."[182]  ITG asserts that Reynolds "could have chosen to enable ITG's joinder [to the Florida Settlement Agreement] by ensuring a base year that would address Philip Morris' objections" regarding the Profit Adjustment.[183]  According to ITG, Reynolds' choice of "a base year number that cemented Philip Morris' objections" led to the 2017 Action enforcing the Florida Settlement Agreement.  This argument seems intertwined with the Profit Adjustment offset issues.[184]  To the extent it is separate, it lacks merit.

---

[180] *Cf. Simple Glob., Inc.*, 2021 WL 2587894, at *13 (holding that a defendant acquiesced where he long expressed his acceptance of the "transfer of stock" before belatedly repudiating the transfer).

[181] *See* 2022 Op. at *19 (quoting 2017 Op. at *12).

[182] Restatement (Second) of Contracts § 350 (1981) ("It is sometimes said that it is the 'duty' of the aggrieved party to mitigate damages, but this is misleading because he incurs no liability for his failure to act.  The amount of loss that he could reasonably have avoided by stopping performance, making substitute arrangements or otherwise is simply subtracted from the amount that would otherwise have been recoverable as damages.").

[183] ITG's Opening Br. 53.

[184] *See supra* Section II.B.1.

"The duty to mitigate generally arises *after* a breach has occurred."[185] The relevant breach is not ITG's non-joinder of the Florida Settlement Agreement. It is ITG's refusal to indemnify Reynolds for the Florida Judgment Liability—the only breach that remains at issue before this court.[186] The conduct ITG complains of occurred long before any such breach of the APA.

As the 2022 Opinion held, ITG assumed liability for the Florida Judgment Liability. ITG's joinder, or lack thereof, does not affect ITG's resulting indemnification obligation. It follows that Reynolds' actions relating to ITG's joinder (or lack thereof) are unrelated to the prior Losses at issue in this litigation.

\* \* \*

For the reasons set forth above, summary judgment is granted in Reynolds' favor on its entitlement to indemnification for the principal Florida Judgment Liability it previously paid and the related Florida Judgment Interest. None of ITG's defenses arguing otherwise have merit. Summary judgment is granted in ITG's favor on Reynolds' lack of entitlement to indemnification for the Florida Attorneys'

---

[185] *NASDI Hldgs., LLC v. N. Am. Leasing, Inc.*, 2019 WL 1515153, at \*7 (Del. Ch. Apr. 8, 2019) (emphasis in original) (citation omitted), *aff'd*, 276 A.3d 463 (Del. 2022).

[186] The parties have not briefed when this harm accrued. *See LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 198 (Del. 2009) (explaining that indemnity accrues when the underlying claim is decided). The APA closed in 2014 but the Florida Judgment was not until 2018, and the appeals of the Florida Judgment were exhausted in 2020.

Fees. Summary judgment is not granted in favor of either party on whether Reynolds is entitled to indemnification for the Delaware Attorneys' Fees. The total amount of Reynolds' damages, whether damages should be reduced by any Profit Adjustment savings Reynolds enjoyed due to ITG's non-joinder, as well as the propriety of pre- and post-judgment interest,[187] will be resolved after trial.

As to future Losses, Reynolds seeks an order of specific performance requiring ITG to either indemnify Reynolds for all future payments Reynolds makes under the Florida Judgment based on ITG's sales of Acquired Brands cigarettes or, alternatively, join the Florida Settlement Agreement.[188] The APA contemplates the availability of injunctive relief.[189] Because certain issues of fact are left to be resolved, however, the suitability of specific performance is appropriately resolved after trial.

---

[187] The parties' briefs thoroughly address their arguments on pre- and post-judgment interest. I do not need further briefing on this issue.

[188] Reynolds' Opening Br. 18; Reynolds' Reply Br. 32-40.

[189] APA § 12.13 ("The Parties hereby acknowledge and agree that the failure of any Party to perform its agreements and covenants hereunder, including its failure to take all actions as are necessary on its part to consummate the transactions contemplated hereby, will cause irreparable injury to the other Parties, for which money damages, even if available, will not be an adequate remedy. Accordingly, each Party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of such Party's obligations and to the granting by any court of the remedy of specific performance of its obligations hereunder, in addition to any other rights or remedies available hereunder or at law or in equity.").

## III. CONCLUSION

Reynolds is entitled to indemnification for the Losses associated with the Florida Judgment Liability based on ITG's sales of the Acquired Brands' cigarettes. Reynolds' damages include the Florida Judgment Interest but exclude the Florida Attorneys' Fees. Reynolds' entitlement to indemnification for the Delaware Attorneys' Fees will be addressed in subsequent proceedings.

The precise amount of Reynolds' damages is an issue reserved for trial, including the appropriateness of any reduction based on the Profit Adjustment allocation. The amount of pre- and post-judgment interest on Reynolds' damages will also be set post-trial. The post-trial resolution of remedies will include whether an order of specific performance should issue.

The parties are directed to prepare an implementing order within 20 days of this decision. They shall also confer on a scheduling order to bring the remaining issues to trial promptly.[190]

---

[190] Trial will be limited to the remaining matters outlined in this decision. I do not anticipate that the parties will need much discovery (if any) in advance of trial given the amount they have already conducted. (The limited outstanding discovery dispute will be resolved separately.) Nor do I foresee needing a lengthy trial.